## IN THE UNITED STATES DISTRIC COURT FOR THE DISTRICT OF COLUMBIA

**JOHN DOE,**

       *Plaintiff,*

   v.

**THE CATHOLIC UNIVERSITY OF AMERICA**
620 Michigan Avenue NE
Washington, D.C. 20064,

**HEIDI ZEICH**

(individually and as agent of University),

**JONATHAN SAWYER**

(individually and as agent of University),

**DESMOND DANIELS**

(as agent of University),

and

**KIM GREGORY**

(as agent of University),

       *Defendants.*

**Case No:** _____

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF AND JURY DEMAND

     Plaintiff John Doe ("Plaintiff" or "John Doe"), by and through his undersigned counsel, hereby files this Complaint against Defendants, the Catholic University of America ("CUA" or "University"), Heidi Zeich ("Defendant Zeich") individually and as an agent of University, Jonathan Sawyer ("Defendant Sawyer") individually and as an agent of University, Desmond Daniels ("Defendant Daniels") as an agent of University, and Kim Gregory ("Defendant

Gregory") as an agent of University (collectively referred to as "Defendants"), to recover damages for Breach of Contract, Intentional Infliction of Emotional Distress, Punitive Damages and Declaratory and Injunctive Relief. Plaintiff alleges and avers as follows:

## PARTIES

1.      Plaintiff John Doe is an adult resident of Washington, D.C. and a former college student at the Catholic University of America ("CUA").

2.      Defendant the Catholic University of America is a private university located at 620 Michigan Avenue NE, Washington D.C., 20064.

3.      Defendant Heidi Zeich is the Assistant Dean of Students at CUA and personally oversaw the events at issue in this complaint.

4.      Defendant Jonathan Sawyer is the Dean of Students at CUA and personally oversaw the events at issue in this complaint.

5.      Defendant Desmond Daniels was the Director of Student Conduct and Ethical Development at CUA and, along with Defendants Zeich and Sawyer, oversaw John Doe's Hearing process. He is now an attorney in Florida.

6.      Defendant Kim Gregory is the Captain of CUA's Department of Public Safety and the deputy Title IX Coordinator. Defendant Gregory oversaw the initial investigation of the events at issue in this complaint.

## JURISDICTION

7.      Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

8.      This Court has subject matter jurisdiction over the federal law claims in this complaint pursuant to 28 U.S.C § 1331

2

9.      This Court has subject matter jurisdiction over the District of Columbia law claims in this complaint pursuant to 28 U.S.C 1367(a).

10.     This Court has personal jurisdiction over CUA and its agents because they are residents of the District of Columbia. D.C. Code § 13-422.

11.     This Court has personal jurisdiction over individual Defendant Zeich because she works full time in the District of Columbia and she engaged in conduct in the District of Columbia that caused tortious injury in the District of Columbia. D.C. Code § 13-423(a).

12.     This Court has personal jurisdiction over individual Defendant Sawyer because he works full time in the District of Columbia and he engaged in conduct in the District of Columbia that caused tortious injury in the District of Columbia. D.C. Code § 13-423(a).

## STATEMENT OF FACTS COMMON TO ALL COMPLAINTS

13.     Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

14.     John Doe first met Jane Doe on August 26, 2014 when Jane Doe attended a party at 1349 Monroe Street NE, Washington D.C.

15.     John Doe and Jane Doe spent much of their time at the party together. John Doe and Jane Doe eventually secluded themselves from other party guests and began to get to know each other. They discussed topics such as Jane Doe's older brother – who also attended CUA – and how Jane Doe was interested in transferring to another school.

16.     The conversation became flirtatious and John Doe and Jane Doe kissed. They engaged in consensual kissing for approximately five minutes. They then separated and continued to mingle with other guests for an amount of time between thirty and forty-five minutes. After, they ran into each other again, and Jane Doe kissed John Doe.

3

17.     John Doe asked Jane Doe if she would like to go upstairs with him; Jane Doe agreed.

18.     John Doe and Jane Doe went upstairs to an unoccupied bathroom. Inside the bathroom, John Doe and Jane Doe continued to kiss and began to remove each other's clothing.

19.     John Doe and Jane Doe engaged in consensual sex in the bathroom. The sexual encounter lasted between ten to fifteen minutes.

20.     John Doe and Jane Doe returned to the party. People had begun to disperse so John Doe offered to walk Jane Doe home. Jane Doe agreed. John Doe dropped Jane Doe off at her dorm room and returned home.

21.     On August 27, 2014, the day after the sexual encounter, Jane Doe and John Doe exchanged text messages and agreed to see each other again. Jane Doe went to John Doe's dorm room with her friend A.W.

22.     Jane Doe and John Doe had a conversation in which they decided not to pursue a romantic relationship and remain friends. John Doe, having class the next morning, asked Jane Doe and A.W. to leave.

23.     The following weekend, Jane Doe attended another party at 1349 Monroe Street NE, Washington D.C. John Doe was flirtatious with other women at the party. Jane Doe became visibly upset when she witnessed John Doe's flirtatious interactions with other women.

24.     On October 29, 2014, John Doe's friend, E.B., informed John Doe that a rumor was circulating around campus that John Doe raped Jane Doe.

25.     John Doe sent a text message to Jane Doe asking her to meet him to discuss the rumor.

4

26.     Jane Doe agreed to meet John Doe on October 30, 2014. During the meeting, Jane Doe agreed that the sexual encounter on August 26, 2014 had been consensual.

27.     Exactly one year later, on October 30, 2015, Jane Doe falsely reported to Defendant Gregory that John Doe had sex with her against her will. Jane Doe reported this knowing it was false and that it would have severe legal and emotional consequences for John Doe.

28.     Defendant Gregory conducted an interview with Jane Doe on October 30, 2015. On November 10, 2015, Defendant Gregory interviewed John Doe. Defendant Gregory initially refused to provide any details of the allegations against John Doe, saying falsely that it was against "school policy" to do so. Finally, after a fifteen-minute conversation, Defendant Gregory reluctantly agreed to provide John Doe with details. However, these details consisted of approximately two sentences of information and merely stated that John Doe was accused of sexual assault.

29.     John Doe cooperated fully with the questioning even though doing so put him at a clear disadvantage. John Doe provided Defendant Gregory his text messages with Jane Doe. These text messages corroborated John Doe's story.

30.     Defendant Gregory conducted a second interview with Jane Doe. At this second interview, Defendant Gregory presented Jane Doe with the text messages John Doe had provided. Defendant Gregory encouraged Jane Doe to explain the text messages. Defendant Gregory attempted to help Jane Doe create a coherent narrative, which Jane Doe was unable to do on her own. Defendant Gregory's inappropriate participation during Jane Doe's second interview demonstrates a clear double standard in this investigation. While Defendant Gregory interviewed Jane Doe twice and gave Jane Doe the opportunity to explain away John Doe's text

messages, Defendant Gregory did not even inform John Doe of the basic information pertaining to Jane Doe's allegations against him.

31.     On November 23, 2015, John Doe received the "Official Investigative Report" ("Report"). The redacted Report only included initials of individuals interviewed and involved in the matter. John Doe was also informed that there would be a Student Disciplinary Hearing in this matter.

32.     John Doe was not permitted to have an un-redacted copy of the Report at any point.

33.     On or around December 20, 2015, John Doe and counsel attended a "University Disciplinary Hearing Intake Meeting" (the "Intake Meeting"). A member of the University General Counsel and Defendants Zeich and Daniels attended the Intake Meeting. During the meeting, a member of the University General Counsel and Defendants Zeich and Daniels informed John Doe and counsel of the Grievance Procedures (the "Procedures") that govern sexual violence complaints to the University (See **Exhibit A**).

34.     The Procedures governed the entirety of the investigation and all proceedings stemming from the investigation. The Procedures call for a Student Disciplinary Hearing ("Hearing") when there is an accusation of sexual assault. A Hearing Board (the "Board") presides over a Student Hearing.

35.     The Procedures are entirely inadequate because they are not designed to discover the truth of what happened. Despite the harsh consequences that come from a finding of responsibility, the Procedures have no provisions to (1) allow an accused to investigate the allegations, (2) ensure proper vetting or introduction of evidence, and (3) train individuals to evaluate the evidence in any manner.

6

36.     In John Doe's case, CUA applied the Procedures in a completely arbitrary and capricious manner. In doing so, CUA failed to follow the Procedures.

37.     During this meeting, a member of the University General Counsel and Defendants Zeich and Daniels emphasized the Privacy section of the Procedures and assured John Doe that all information regarding the Hearing would be kept confidential to only those in the Hearing room. They also informed John Doe that he was not allowed to (1) talk to anyone about the matter (even his own witnesses), (2) investigate the matter in any way, and (3) know the names of those interviewed during CUA's investigation.

38.     During this meeting, Defendant Zeich repeatedly scoffed at John Doe's procedural questions and was openly hostile to both John Doe and his counsel. Defendant Zeich also possessed an un-redacted copy of the Report, but refused to allow John Doe to view it in its entirety or take note of the names of opposing witnesses. When asked why John Doe was not allowed to know the identities of those interviewed, Defendant Zeich scoffed and said that it was against school policy.

39.     Defendant Zeich further stated to John Doe that he could submit questions for all witnesses in advance and provide his own witnesses, as long as they were not character witnesses.

40.     Defendant Zeich explained that during the Hearing, neither John Doe nor Jane Doe could ask questions verbally to the either party; they could only pass questions written on note cards to the Board. Once the note card is passed to the Board, the Board can choose to either ask the question as written, not ask it at all, or rephrase it in any way.

41.     Defendant Zeich also explained that all questions must go through the Dean of Students to establish relevancy and that John Doe could not challenge the Dean of Student's decision to deny John Doe's questions.

42.     The determination of whether to allow a question appears to be entirely within the arbitrary discretion of CUA, or, in this case, Defendant Sawyer. There is no procedure in place for Defendant Sawyer to objectively determine the relevancy of a question for the Board.

43.     In the Report, Jane Doe stated that she took shots of vodka in the "quiet room." John Doe knew for a fact that no such "quiet room" existed in the house. When asked if John Doe could present a witness that could testify to that fact, Defendant Zeich responded by saying "no, that would be more about fraternity habits." In short, Defendant Zeich stated that Jane Doe had the right to claim that an assault happened in a location, and John Doe was not allowed to question the existence of that location. This signifies another clear double standard.

44.     John Doe was given less than a month to prepare for a Hearing scheduled for January 15, 2016.

45.     On January 6, 2016, Defendant Zeich provided John Doe with a list of Jane Doe's seven witnesses. Defendant Zeich specifically told John Doe he could not speak to Jane Doe's witnesses or investigate their claims or potential biases, and that doing so would violate school policy, subjecting John Doe to further disciplinary action.

46.     One of these witnesses was S.S., a fraternity brother who had a public vendetta against John Doe. S.S. admittedly had no knowledge of the incident in question but was allowed and invited to participate. CUA and its employees gave no indication why witnesses with no direct knowledge of Jane Doe's accusations, such as S.S., were allowed to testify on Jane Doe's behalf but not on behalf of John Doe.

8

47.     Another of these witnesses was Jane Doe's brother, E.H. Even though he admittedly had no knowledge of the incident or even the night in question, E.H. was allowed and invited to participate. E.H. could only give character testimony, clearly violating CUA directions to John Doe.

48.     Another of Jane Doe's witnesses was A.W. A.W. was allowed to provide more character testimony for Jane Doe. A.W. also described Jane Doe as "distraught" on the walk back to campus from another party at 1349 Monroe Street NE, Washington D.C. two days after the alleged incident.

49.     In accordance with Defendant Zeich's instructions, John Doe provided CUA with his questions and witnesses on or around January 13, 2016. When John Doe submitted his witnesses, he told CUA he had witnesses who could testify regarding Jane Doe's behavior after the incident to prove he did not assault her. CUA denied John Doe the right to call these witnesses and provided no explanation other than the witnesses did not have direct knowledge of the event. Yet, Jane Doe and CUA were allowed to invite witnesses that violated that exact rubric to participate.

50.     John Doe also noted through counsel that Defendant Gregory only included some of John Doe's text messages with Jane Doe in the Report. John Doe gave Defendant Gregory all text messages with Jane Doe. Defendant Gregory excluded text messages from August 27 through August 30, 2014 from the Report. The excluded text messages between John Doe and Jane Doe coincide with the two times they met up after the initial party on or around August 27 through August 30, 2014. Defendant Gregory excluded the friendly communication between John Doe and Jane Doe that occurred on or around August 27 through August 30, 2014. In doing

so, Defendant Gregory attempted to create the illusion that Jane Doe left John Doe's dorm room on August 27, 2014 in fear of John Doe, a blatant falsehood.

51.     Despite CUA's commitment to obtain all available evidence as directly specified in the Procedures, CUA blocked and denied the testimony of all but one of John Doe's witnesses. CUA notified John Doe of this decision at 8:00pm the night before the Hearing.

52.     Jane Doe specifically named D.H. in her complaint. John Doe also listed D.H. as a witness. Jane Doe stated that D.H. had given her three shots of vodka right before she had sex with John Doe. CUA deemed D.H.'s testimony wholly irrelevant and blocked him from participating in the Hearing. If D.H. testified, he would have denied this alleged fact, indicating that Jane Doe fabricated her claim that she lost consciousness prior to having sex with John Doe.

53.     CUA also denied N.K., another of John Doe's witnesses. N.K. would have testified that Jane Doe was not drunk on the night in question, in direct contradiction to Jane Doe's own testimony. CUA deemed N.K.'s testimony wholly irrelevant and blocked her from participating in the Hearing.

54.     CUA also denied E.B., another of John Doe's witnesses. E.B. walked back to campus with Jane Doe from another party at 1349 Monroe Street NE, Washington, D.C. three days after the party. E.B. would have testified that Jane Doe was not distraught on the walk back to campus, directly contradicting A.W.'s statement. CUA deemed E.B.'s testimony wholly irrelevant and blocked her from testifying in the Hearing.

55.     CUA gave no explanation for its decision to block John Doe's witnesses from testifying in the Hearing. CUA denied John Doe the opportunity to challenge the decision in any way or even present what his witnesses' testimonies would have been to the Board.

56.     In contrast, CUA allowed Jane Doe six witnesses (one did not show up to the Hearing). None of Jane Doe's witnesses were present during the alleged incident.

57.     Defendants Zeich and Sawyer decided whether to allow or deny the witnesses for the Hearing. These decisions on how to conduct the Hearing were clearly made in a wholly arbitrary and capricious manner, showing a clear bias towards Jane Doe and violating University policy to "obtain all available evidence."

58.     Furthermore, Defendants Zeich and Sawyer demonstrated that they acted with actual malice in allowing E.H.'s character testimony against John Doe. Defendants Zeich and Sawyer either knew or reasonably should have known that CUA specifically stopped John Doe from bringing relevant fact witnesses, as well as character witnesses. However, through Defendants Zeich and Sawyer, CUA allowed such witnesses for Jane Doe.

59.     The Student Disciplinary Hearing took place on January 15, 2016. At the Hearing, Jane Doe was present with her counsel. Four fact-finders presided over the Hearing and Defendant Zeich reiterated the privacy section of the Procedures, assuring those present that "no one outside this room will receive information about this Hearing" and that it "is highly confidential."

60.     Defendants Daniels and Zeich, the "advisors to the Board," oversaw the proceeding and placed all witnesses in one room without supervision.

61.     In the moments before the Hearing, John Doe received a text message from his only witness, D.G. In his text message to John Doe, D.G. stated that Jane Doe's witnesses were talking to each other and planning their testimony.

62.     John Doe immediately raised his concern that Jane Doe's witnesses were colluding. Defendants Zeich and Daniels disregarded John Doe's allegation.

11

63.     Then, John Doe repeatedly raised his concern that Jane Doe's witnesses were colluding to the Board. Each time, the Board told John Doe they would "think about it and keep [his concern] in mind." Through Defendant's Daniel's and Zeich's inaction, CUA wholly neglected to address whether Jane Doe's witnesses had colluded until right before Jane Doe's last witness testified. At that point, CUA's action made no difference in the proceeding because the witness collusion had already occurred.

64.     In her opening statement to the Board, Jane Doe stated she got "so drunk off of beer and jungle juice" that she did not remember the encounter at all.

65.     All Jane Doe's witnesses that attended the party stated that Jane Doe seemed "totally fine" when they left the party. Jane Doe encountered her witnesses after a couple hours of playing beer pong. These testimonies contradict Jane Doe's testimony that she got "so drunk." The Board prevented John Doe from asking any questions that would make this contradiction clear to the Board.

66.     On or about five separate instances, Jane Doe's counsel met privately with Defendant Zeich, Defendant Sawyer and CUA's General Counsel representatives during the Hearing. These meetings sometimes took place in the middle of Jane Doe's questioning by the Board. The Board told John Doe and his counsel that they were not permitted to know the content of these meetings.

67.     During the Hearing, D.G. testified that he saw John Doe and Jane Doe immediately after they had sexual intercourse, before they walked home. D.G. testified that both John Doe and Jane Doe seemed normal and happy. D.G. also testified that there was only beer at the party, not jungle juice.

68.     At one point during the Hearing, John Doe and his counsel noticed one of the Board members checking sports scores on his phone and not paying attention to the Hearing. It is unclear how the Board could have come to an informed conclusion when at least one of the members was actively choosing to not pay attention to the proceedings.

69.     A.W., Jane Doe's final witness, admitted to discussing witness testimonies with other witnesses, directly violating Procedures. A.W. also testified that Jane Doe was distraught on the walk home on August 29, 2014. As stated earlier, John Doe had a witness willing to testify that this was false, but CUA excluded that witness' testimony without explanation.

70.     In her closing statement, Jane Doe said D.H. had handed her three shots to drink. The Board denied John Doe any witness testimony or opportunity whatsoever to oppose Jane Doe's statement.

71.     Immediately after the Hearing, John Doe and his counsel asked Defendant Zeich to keep a record of all proceedings in case of future litigation. Defendant Zeich responded with a callous "we'll do what we think is best," again showing open hostility to John Doe.

72.     Twelve days after the Hearing, John Doe was asked to come to the Dean of Students' Office. Following CUA's procedures, John Doe was handed a document that stated he was found responsible for sexually assaulting Jane Doe. Additionally, the document stated that the Board, through private deliberation, found Jane Doe incapable of giving consent due to intoxication. It also stated that John Doe was suspended from attending CUA until August of 2018, a two-and-a-half-year suspension. As part of this punishment, John Doe was banned from all University property, lands, and events, effective immediately.

73.     However, Defendant Daniels told John Doe in this meeting that John Doe was permitted to continue attending classes until the appeal process concluded. There is no provision

in the Procedures that would have allowed for this. If John Doe had taken this advice he would be liable financially for the semester, as this would extend pass the "add/drop" period.

74.     Through counsel, John Doe submitted an appeal pursuant to the Procedures on February 3, 2016.

75.     On February 12, 2016, John Doe received an email denying his appeal

76.     Soon thereafter, as the student body learned of the suspension, John Doe lost almost all the friends he had made at CUA. In addition, the president of John Doe's fraternity informed him "the chapter needed to distance itself from [him]," effectively and literally banning him from chapter and fraternity events. Both socially and academically, John Doe lost everything he had worked for in his years at CUA.

## COUNT 1

### Breach of Contract by CUA

77.     Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

78.     John Doe applied to and enrolled at CUA. With the assistance of his parents, John Doe paid tuition, fees, and other expenses in reliance and on the understanding that CUA would implement and enforce CUA policies in compliance with applicable law and not in a capricious or arbitrary manner.

79.     These policies and procedures specifically included the Sexual Assault Grievance Policy (Attached as Exhibit A).

80.     CUA policies create an express contract, or alternatively, a contract implied in law or in fact, between CUA and those who enroll as students at CUA. As a student at CUA, John Doe was entitled to the benefit of this contract.

14

81.     The contract created a duty on the part of CUA and its agents to administer those policies according to the dictates contained therein. CUA and its agents failed to do so, *inter alia*, when they (1) allowed Jane Doe's witnesses to collude with each other in direct contravention of the policy, (2) refused to allow evidence in the form of text messages in direct contravention of its policies to gather all available evidence, and (3) refused to allow John Doe to call witnesses with direct factual knowledge of the event.

82.     CUA also had a duty of good faith and fair dealing in its actions under the contract. It breached this duty when CUA and its agents worked to assure that the Hearing resulted in John Doe being held responsible. CUA and its agents did this when it (1) allowed character witnesses on behalf of Jane Doe, but not John Doe, (2) refused to allow John Doe to investigate the case against him, and (3) refused to allow John Doe to ask any questions that would allow the Board to understand the false nature of Jane Doe's testimony.

83.     CUA breached its contract with John Doe, *inter alia*, by (1) applying CUA policies in an arbitrary and capricious manner, (2) failing to properly apply CUA policies, (3) having policies in place that were so deficient that they could not possibly reach an accurate determination of any fact, and (4) acting in manner that had no semblance of good faith and fair dealing.

## COUNT 2

### Promissory Estoppel against CUA (in the alternative to Count 1)

84.     Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

85.     CUA and its agents promised John Doe that any adjudication of allegations of sexual misconduct would be conducted according to policies outlined by CUA in its Procedures. CUA and its agents further promised that those Procedures would be conducted in a fair manner.

86.     John Doe relied on these promises when he accepted CUA's offer to become a student and incurred the cost of tuition and related expenses, as well as the opportunity cost of choosing CUA and foregoing admission to other institutions of higher learning.

87.     John Doe's reliance on the above promises was to his detriment because he enrolled at a university that failed to have policies in place that properly protected those falsely accused of sexual assault and failed to properly administer the policies that were in place.

## COUNT 3

### Intentional Infliction of Emotional Distress against Defendant Zeich

88.     Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

89.     Defendant Zeich's behavior during all matters prior to the Hearing, and during the Hearing itself, was outrageous and intentional. It was done specifically to injure John Doe and assure a result that found John Doe responsible for the alleged conduct of which he was accused.

90.     As a result of Defendant Zeich's conduct, John Doe suffered severe emotional distress, suicidal ideation, and mental health issues that continue to this day.

91.     Aggravated by actual malice, Defendant Zeich acted intentionally when she took actions to assure that the Hearing would be biased against John Doe.

92.     At the time of the alleged conduct and subsequent proceedings, John Doe was a student in Defendant Zeich's charge. Defendant Zeich intentionally disregarded John Doe's well-being by purposely assuring that John Doe could not properly defend himself at the Hearing, by,

*inter alia*, (1) not allowing John Doe to investigate the case, (2) refusing to allow John Doe to call witnesses, and (3) allowing Jane Doe to call whichever witnesses she chose.

93.       This malicious intentional conduct allows for the recovery of punitive damages in this matter.

## COUNT 4

### Intentional Infliction of Emotional Distress Against Defendant Sawyer

94.       Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

95.       Defendant Sawyer's conduct during the investigation of John Doe's alleged conduct, all matters prior to the Hearing, and the Hearing itself was outrageous and intentional. It was done specifically to injure John Doe and assure a result that found John Doe responsible for the conduct of which he was accused.

96.       As a result of Defendant Sawyer's conduct, John Doe suffered severe emotional distress, suicidal ideation, and mental health issues that continue to this day.

97.       Aggravated by actual malice, Defendant Sawyer acted intentionally when he took actions to assure that the Hearing would be biased against John Doe.

98.       At the time of the alleged conduct and subsequent proceedings, John Doe was a student in Defendant Sawyer's charge. Defendant Sawyer intentionally disregarded John Doe's well-being by purposely assuring that John Doe could not properly defend himself at the Hearing, by, *inter alia*, (1) not allowing John Doe to investigate the case, (2) refusing to allow John Doe to call witnesses, and (3) allowing Jane Doe to call whichever witnesses she chose.

99.       This malicious intentional conduct allows for the recovery of punitive damages in this matter.

17

## COUNT 5

### Intentional Infliction of Emotional Distress against CUA

100.     Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

101.     At all relevant times, Defendants Zeich and Sawyer were agents of CUA, under its direction and control.

102.     CUA is liable for the tortious conduct of its agents.

103.     Defendants Sawyer and Defendant Sawyer's conduct during the investigation of John Doe's alleged conduct, all matters prior to the Hearing, and the Hearing itself was outrageous and intentional. It was done specifically to injure John Doe and assure a result that found John Doe responsible for the conduct of which he was accused.

104.     As a result of Defendants Sawyer and Zeich's conduct, John Doe has suffered severe emotional distress, suicidal ideation, and mental health issues that continue to this day.

105.     Aggravated by actual malice, Defendants Sawyer and Zeich acted intentionally when they took actions to assure that the Student Disciplinary Hearing would be biased against John Doe.

106.     John Doe was a student in Defendant Sawyer and Zeich's charge. Defendants Sawyer and Zeich intentionally disregarded John Doe's well-being by purposely assuring that John Doe could not properly defend himself at the Student Disciplinary Hearing when they, *inter alia*, (1) did not allow John Doe to investigate the case, (2) refused to allow John Doe to call witnesses, and (3) allowed Jane Doe to call whichever witnesses she chose.

107.     This malicious intentional conduct allows for the recovery of punitive damages in this matter.

## COUNT 6

### Negligent Training and Supervision

108.     Plaintiff John Doe realleges and incorporates the foregoing paragraphs as fully contained herein.

109.     At all relevant times, CUA employed Defendants Zeich, Sawyer, and Gregory.

110.     CUA had a duty to ensure that those it entrusted to supervise and apply its policies did so in a fair manner that would not injure CUA students.

111.     CUA knew, or should have known through reasonable investigation, that Defendants Zeich, Sawyer, and Gregory were not capable of properly instituting CUA policies, including but not limited to the policies associated with Procedures.

112.     CUA knew, or should have known through reasonable investigation, that Defendants Zeich, Sawyer, and Gregory would commit the tort of Intentional Infliction of Emotional Distress against John Doe.

113.     Because of CUA's negligent training and supervision of Defendants, Plaintiff John Doe suffered severe and costly injuries.

## COUNT 7

### Violation of Title IX by CUA-Discrimination by CUA

114.     Plaintiff John Doe realleges and reincorporates all the foregoing paragraphs as contained herein.

115.     Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 are laws designed to prevent sexual discrimination in educational intuitions receiving federal funds.

116.     CUA receives federal financial assistance and is subject to Title IX.

117.    Title IX prohibits discrimination on the basis of sex in a school's educational programs and activities. This applies to all school operations. Title IX makes clear that students must not be denied access to educational benefits and opportunities on the basis of gender.

118.    The Sexual Grievance Policy at issue in this case was enacted in part to comply with Title IX.

119.    Title IX requires that CUA make impartial and reliable investigation of complaints. It also requires that CUA employees have adequate training to conduct investigations regarding sexual harassment complaints.

120.    CUA knew or should have known that its employees, including but not limited to, Defendants Sawyer, Zeich, Daniels, and Gregory, did not have the training and ability to carry out their responsibilities under Title IX.

121.    At one point, Defendant Gregory, CUA's designated Title IX investigator, openly stated that nothing gave her more professional satisfaction than helping women prevail in student disciplinary procedures where a woman accused a man of sexual misconduct. This statement is just one indication of the bias CUA had in its proceedings.

122.    The obvious advantages given to Jane Doe during the Hearing indicated CUA and its employees were favoring Jane Doe over John Doe.

123.    CUA was under investigation by the Department of Education Office of Civil Rights for not properly investigating complaints by women. Upon information and belief, CUA aggressively disciplined Plaintiff John Doe in an attempt to prove that it was effectively policing accusations of sexual assault.

124.    CUA actively discriminated against Plaintiff John Doe based on his gender and conducted the Student Disciplinary Hearing in a manner that provided preferential treatment to

Jane Doe. Such preferential treatment included, but was not limited to, allowing Jane Doe to call character witnesses, allowing Jane Doe's witnesses to collude with one another, and selectively excluding evidence that would have shown Jane Doe was not telling the truth.

125.    CUA and its employees wrongly found John Doe in violation of policies and procedures enacted in compliance with Title IX.

126.    This finding was made because of CUA's gender discrimination against Plaintiff John Doe and CUA's bias in favor of Jane Doe.

127.    This discrimination caused Plaintiff John Doe economic and non-economic damages.

## COUNT 8

### Violation of Title IX-Deliberate Indifference

128.    Plaintiff John Doe realleges and reincorporates all the preceding paragraphs as contained herein.

129.    CUA's employees and agents, including but not limited to Defendants named in this Complaint, acted with deliberate indifference toward John Doe because of his male gender.

130.    CUA had actual notice that its agents and employees were violating John Doe's rights under CUA's policies.

131.    CUA had the authority to take corrective measures that would assure that John Doe was treated fairly and without deliberate indifference in the investigation of the matter that led to the Student Disciplinary Hearing.

132.    CUA had the authority to take corrective measures to assure that CUA and its agents were not acting with deliberate indifference toward John Doe because of his gender and correct the erroneous outcome of the Student Disciplinary Hearing.

133.     CUA and its agents refused to take any corrective action and the deliberate inference caused John Doe economic and non-economic damages.

### COUNT 9

### Violation of Title IX-Erroneous Outcome (in the alternative to counts 1 and 2)

134.     Plaintiff John Doe realleges and reincorporates the foregoing paragraphs as contained herein.

135.     By suspending John Doe, CUA violated Title IX and its associated regulations and statutes.

136.     CUA and its agents and employees conducted the investigation that led to the Student Disciplinary Hearing in violation of Title IX.

137.     CUA and its agents and employees had the authority to take corrective action to remedy violations of Title IX and its accompanying laws and regulations in the investigative process and the Student Disciplinary Hearing.

138.     CUA took no corrective action and the violation of Title IX and its accompanying laws and regulations led to an erroneous outcome in the Student Disciplinary Hearing.

139.     This outcome caused John Doe economic and non-economic damages.

### COUNT 10

### Declaratory and Injunctive Relief Against CUA

140.     Plaintiff John Doe realleges and incorporates the foregoing paragraphs as contained herein.

141.     The process by which CUA found John Doe responsible for the conduct of which he was accused was in violation of a contract between John Doe and CUA.

22

142.    The process was administered in a manner that was wholly capricious and arbitrary and in no way comported with any notion of fair dealing.

143.    The result of the process, which was faulty and constituted a breach of the contract between John Doe and CUA, had, and continues to have, severe professional and emotional consequences for John Doe.

144.    CUA's unlawful discipline caused, and continues to cause, irreparable harm to John Doe.

145.    CUA's unlawful discipline cannot be remedied solely by an award of monetary damages.

146.    Based on the facts articulated in this Complaint and the facts to be proven at trial, John Doe is entitled to injunctive relief which includes, but is not limited to, an Order requiring CUA to expunge John Doe's official record from any and all information related to this incident.

147.    Such an Order will cause CUA no harm because CUA has no interest in unlawful student discipline.

148.    Granting such relief will advance the public interest in assuring that CUA and other institutions in the District of Columbia conduct all student disciplinary proceedings in a lawful manner.

## JURY DEMAND

149.    Plaintiff John Doe hereby demands a Trial by Jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court assume jurisdiction of this action and grant the following relief:

A.      A Trial by Jury;

23

B.      Award Plaintiff general damages in an amount to be proved at trial for general damages in an amount of not less than One-Million Dollars ($1,000,000.00), compensatory damages, declaratory relief, injunctive relief, attorney's fees and costs, and any other relief this Court deems appropriate;

C.      Award Plaintiff Declaratory and Injunctive Relief under Count 10; and

D.      Award Plaintiff any such other relief that this Court may deem just and proper.


Respectfully submitted,


Date: July 10, 2017                                _____

Jesse Winograd, Esq. DC Bar # 986610
JWinograd@gowenrhoades.com
Gowen Rhoades Winograd & Silva PLLC
513 Capitol Court N.E., Suite 100
Washington, DC 20002
Phone: 202-380-9355
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th of July 2017, a copy of the foregoing Complaint was served via U.S. first class mail to:


Lawrence Morris
General Counsel
The Catholic University of America
620 Michigan Avenue, NE
Washington, DC 20064

Heidi Zeich
The Catholic University of America
620 Michigan Avenue, NE
Washington, DC 20064

Jonathan Sawyer
The Catholic University of America
620 Michigan Avenue, NE
Washington, DC 20064


Respectfully submitted,

Date: July 10, 2017

Jesse Winograd, Esq. DC Bar # 986610
JWinograd@gowenrhoades.com
Gowen Rhoades Winograd & Silva PLLC
513 Capitol Court N.E., Suite 100
Washington, DC 20002
Phone: 202-380-9355
*Counsel for Plaintiff*