# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BENJAMIN NORTH**, Plaintiff, v. **CATHOLIC UNIVERSITY OF AMERICA** *et al.*, Defendants. | Case No. 1:17-cv-01373 (TNM) |

## MEMORANDUM OPINION

Plaintiff Benjamin North, a former student at Catholic University of America ("Catholic" or the "University"), filed a 12-count Complaint against the University and four administrators (collectively, the "Defendants") based on the University's investigation and disciplinary proceedings into an allegation of sexual assault made against him by another student. First Am. Compl. 21-35. The hearing panel found Mr. North, who claimed that the encounter was consensual, responsible for sexual assault because Jane Doe was incapable of giving consent due to intoxication. *Id.* ¶ 20, 95. Mr. North was suspended for two and a half years. *Id.* He alleges that the University's procedures were not "adequate, reliable, and impartial;" violated Title IX of the Education Amendments of 1972, including its due process provisions; and were conducted contrary to the University's stated procedures. *Id*. ¶¶ 100-02. Mr. North seeks monetary damages and declaratory and injunctive relief. *Id*. 35-36. The University has moved to dismiss four of Mr. North's claims as well as all other claims against the individual defendants alleged to be acting in their official capacities. Defs.' Mot. for Partial Dismissal ("Mot. to Dismiss") 2,

ECF No. 19. Having confirmed that jurisdiction and venue is proper in this Court,[1] and upon consideration of the pleadings, relevant law, and related legal memoranda in opposition and in support, I find that Mr. North has failed to sufficiently allege his claims for intentional infliction of emotional distress, has not established that a tort for breach of "basic fairness" exists under District of Columbia law, and has conceded his claims against the individual defendants as sued in their official capacities. Accordingly, the Defendants' motion will be granted. Counts Three, Four, and Five will be dismissed without prejudice. Count Eight will be dismissed with prejudice. For all remaining counts, any claims alleged against the individual defendants in their official capacities will also be dismissed with prejudice.

I.  **Background**

According to the operative Complaint, on August 26, 2014, Benjamin North, then a student at Catholic, attended a house party near campus, where he met Jane Doe. First Am. Compl. ¶ 15. After spending some time with each other throughout the night, Mr. North and Ms. Doe engaged in sexual intercourse in an unoccupied room in the house, after which Mr. North walked Ms. Doe back to her dorm room. *Id.* ¶¶ 16-21. The next day, after exchanging several text messages, Mr. North and Ms. Doe saw each other and agreed to remain friends. *Id.* ¶¶ 22-23. Over two months later, on October 29, 2014, a friend informed Mr. North that a rumor was circulating that the sexual encounter between him and Ms. Doe was not consensual. *Id.* ¶ 25. The next day, after agreeing over text message to Mr. North's request to meet to discuss the rumor, Ms. Doe allegedly represented to Mr. North that their sexual encounter was consensual. *Id.* ¶ 27. A year after that, on October 30, 2015, Ms. Doe reported to

---

[1] 28 U.S.C. §§ 1331, 1367(a).

the University's Department of Public Safety Captain and Title IX deputy coordinator that she did not consent to the sexual intercourse. *Id.* ¶ 28.

The report prompted an investigation by the University, which, as a recipient of federal funds, is forbidden by Title IX of the Education Amendments of 1972 from discriminating on the basis of sex in its school operations. *Id*. ¶¶ 29-30. The Department of Education regulations on sexual harassment ("2001 Guidance")—promulgated by notice-and-comment rulemaking—afford "due process to both parties involved" by providing an "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence" and giving employees "adequate training as to what conduct constitutes sexual harassment." *Id*. ¶¶ 35-37. In April 2011, the Department of Education issued a guidance document, known as a "Dear Colleague Letter," that detailed compliance with Title IX to include, among other procedures, the "equal opportunity [by the complainant and the accused student] to present relevant witnesses and other evidence," "similar and timely access [by both parties] to any information that will be used at the hearing," to "maintain documentation of all proceedings," and for the "fact-finder and decision-maker [to] have adequate training or knowledge regarding sexual violence." *Id*. ¶ 38. A further guidance document issued by the Department of Education in April 2014 further detailed compliance to include an "adequate, reliable, impartial, and prompt [investigation] and include the opportunity for both parties to present witnesses and other evidence" and for "[a]ll persons involved in conducting a school's Title IX investigations [to] must have training or experience in handling complaints of sexual violence and in the school's grievance procedures." *Id.* ¶ 39.[2]

---

[2] Amid widespread criticism of the April 2011 and April 2014 guidance, including the criticism that the guidance denied accused students fair process, the Department of Education rescinded both documents in September 2017. The 2001 Guidance, promulgated through notice-and-

Mr. North alleges a multitude of errors throughout the University's investigation, including that its procedures "have no provisions to (1) allow an accused to appropriately and thoroughly respond to allegations, (2) ensure proper vetting or introduction of evidence, including witness testimony, and (3) train individuals to appropriately conduct investigation[s] and hearings, including the evaluation of relevant evidence." *Id.* ¶ 100. In support, he alleges, *inter alia*, that University officials showed favor to Ms. Doe from the inception of the investigation through the Student Disciplinary Hearing (the "Hearing") that found Mr. North responsible for sexually assaulting Ms. Doe and imposed a two and a half year suspension. *See id.* ¶¶ 52-95. He alleges that during initial interviews with Ms. Doe, Kim Gregory, Captain of the University's Department of Public Safety and Title IX deputy coordinator, inappropriately "help[ed] Jane Doe create a coherent narrative" and afforded Ms. Doe the opportunity to "explain away [Mr. North]'s text messages" while not providing Mr. North the "basic information pertaining to Jane Doe's allegations against him." *Id.* ¶ 52. Mr. North claims that he was not permitted to respond to a redacted "Official Investigative Report" (the "Report") distributed prior to the Hearing, nor was he provided an unredacted copy of the Report, *id.* ¶¶ 53-54, and that Ms. Gregory failed to include in the Report other relevant text messages between himself and Ms. Doe that would have supported his side of the story. *Id.* ¶¶ 71-72.

During an "University Disciplinary Hearing Intake Meeting" attended by Mr. North, his counsel, Heidi Zeich (the Assistant Dean of Students), and Desmond Daniels (then Director of Student Conduct and Ethical Development), Ms. Zeich "repeatedly scoffed at [Mr. North]'s procedural questions [about the upcoming hearing] and was openly hostile to both [Mr. North]

---

comment rulemaking, remains intact. U.S. DEP'T OF EDUCATION, *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (last visited Apr. 30, 2018).

4

and his counsel." *Id.* ¶ 57. Ms. Zeich also reportedly refused to permit Mr. North's counsel to take notes and said it was school policy that Mr. North was not permitted to know the identities of opposing witnesses, *id.* ¶¶ 57-58, even though she did eventually provide Mr. North with a list of Ms. Doe's witnesses nine days before the Hearing. *Id.* ¶ 64. Ms. Zeich also allegedly refused to permit Mr. North to present a witness at the Hearing to challenge Ms. Doe's statements as included in the Report. *Id.* ¶ 62.

Mr. North alleges that during the Hearing, the University permitted several students who did not have direct knowledge of the incident to participate as witnesses for Ms. Doe, but that Ms. Zeich and Jonathan Sawyer, Dean of Students, only permitted one of his witnesses to testify even though his proposed witnesses had direct interactions with Ms. Doe on the night of the incident. *Id.* ¶¶ 65-68, 73-79. If permitted to testify, Mr. North proffers that his witnesses would have refuted Ms. Doe's story that she was given three shots of vodka by a third party prior to having sex with Mr. North, that she was drunk that night, and that she was distraught on the walk home from the party. *Id.* ¶¶ 74-76. Mr. North also quarrels with not being permitted to ask any of his pre-submitted questions, or questions pertaining to the level of Ms. Doe's intoxication. *Id.* ¶¶ 69, 87. He also contends that the Hearing panel dismissed his concern that Ms. Doe's witnesses, who were all held in the same room at Mr. Daniels's and Ms. Zeich's direction, were reportedly "talking to each other and planning their testimonies," *id.* ¶¶ 82-85, and that the University "took no corrective action" after one of Ms. Doe's witnesses admitted to discussing witness testimony with other witnesses. *Id.* ¶ 91. It was also improper, according to Mr. North, for Ms. Doe's counsel to have been permitted approximately five private meetings in the middle of the Hearing with Ms. Zeich, Mr. Sawyer, and the University's General Counsel without Mr. North's counsel's participation. *Id.* ¶ 88. Mr. North also alleges that the Hearing board's

5

fact-finders were not appropriately trained for their role and that one of the members was flagrantly not paying attention during the Hearing. *Id.* ¶¶ 81, 90. Additionally, when Mr. North's counsel asked Ms. Zeich to keep a record of the proceedings for future litigation, she reportedly refused to commit to doing so. *Id.* ¶ 94. In Mr. North's views, Ms. Zeich's and the other administrators' actions showed "open hostility to [Mr. North] and demonstrate[ed] [the University's] disregard for federal regulations." *Id.*

## II. Legal Standard

A party may move to dismiss a complaint, or a specific count therein, on the ground that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) mandates "a short and plain statement of the claim showing that the pleader is entitled to relief." This requires the complaint to contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is insufficient if it merely offers "'labels and conclusions'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 546). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and pleading facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 545-46.

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-pled factual allegations. *See In re United Mine Workers of Am.*

6

*Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). The Court does not accept as true legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Last, "[i]n determining whether a complaint fails to state a claim, [the court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017).

**III. Analysis**

The University has moved to partially dismiss the Complaint on three grounds: (1) that Mr. North has failed to state a claim for intentional infliction of emotional distress, (2) that no tort of breach of "basic fairness" exists under District of Columbia law, and (3) that his claims against the individual administrators are duplicative of those against the University. Mot. to Dismiss 2. Each basis is discussed in turn.

**A. Mr. North Failed to State a Claim for Intentional Infliction of Emotional Distress**

The University seeks to dismiss all of Mr. North's claims for intentional infliction of emotional distress (Counts Three, Four, and Five) for failure to state a claim. Count Three is alleged against Ms. Zeich in her individual capacity, Count Four is alleged against Mr. Sawyer in his individual capacity, and Count Five is alleged the University. First Am. Compl. ¶¶ 114-39. Because this Court exercises supplemental jurisdiction over these state law claims as all "deriv[ing] from a common nucleus of operative fact," *United Mine Workers of America v.*

*Gibbs*, 383 U.S. 715, 725 (1966), the Court applies District of Columbia law to the claims. *See Dimond v. District of Columbia*, 792 F.2d 179, 188 n.6 (D.C. Cir. 1986).

In the District of Columbia, a *prima facie* showing of intentional infliction of emotional distress requires "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (internal quotation marks omitted). To meet the first prong, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. As to the second prong, intent or recklessness may be inferred from the "very outrageousness of a defendant's conduct." *Id*. On a motion to dismiss, the pertinent question "is whether an impartial jury could reasonably find that the defendants' conduct, as described by the plaintiff, and with all reasonable inferences drawn in the plaintiff's favor, was sufficiently outrageous to satisfy this concededly demanding standard." *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002). Liability will not ensue for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998).

Conduct that has been found sufficient to meet this high bar includes knowingly reporting false information to the police, *Carter v. Hahn*, 821 A.2d 890, 895 (D.C. 2003), as well as to regulatory authorities, *Kassem v. Washington Hosp. Ctr.*, 513 F.3d 251, 257 (D.C. Cir. 2008). But outside of the involvement of government authorities, which is not alleged in Mr. North's case, the District of Columbia Court of Appeals has found that it was not legally sufficient conduct to sustain an intentional infliction of emotional distress claim where an employer "targeted [an employee] for a sexual harassment investigation, manufactured evidence against

8

him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him." *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997).

The parallels to *Kerrigan* are particularly instructive here. Mr. North alleges that he was unfairly treated during the University's investigation and disciplinary hearing, including permitting and presenting evidence that favored Ms. Doe's side of the story without affording him the same opportunity. *See, e.g*, First Am. Compl. ¶¶ 52, 62, 69. He also alleged that the Hearing panel was not adequately trained to properly conduct their fact-finding role and that, as a result of the University's flawed process and failure to have or follow its own procedures, he was erroneously held responsible for the offense and suspended from the school. *Id.* ¶¶ 81, 161. He claims that the University's administrators demonstrated "a clear bias" against him, were "openly hostile" to him, and acted with "actual malice" in determining which witnesses could testify at the Hearing. *Id.* ¶¶ 57, 79, 80, 94. Even drawing all reasonable inferences in Mr. North's favor, however, these facts are less egregious than those in *Kerrigan*. Notably, in *Kerrigan*, the subject of the investigation sought unsuccessfully to confront the witnesses that provided information featured in an allegedly inaccurate progress report. 705 A.2d at 626. The investigation also allegedly was prompted by the supervisor's personal animosity against the subject. *Id*. And despite being allegedly personally targeted in the investigation and suffering a negative employment consequence, the court found that this was a type of "employer-employee conflict[] [that] do[es] not, as a matter of law, rise to the level of outrageous conduct." *Id.* at 628.

Mr. North argues that *Kerrigan* has less force when applied to his case because *Kerrigan* was in the employer-employee context, and directs the Court to *Kassem v. Washington Hosp.*

9

*Ctr.* as the more persuasive example. Pl.'s Opp. 3. But *Kassem* was also an employer-employee case, and Mr. North presents no other authority indicating that *Kerrigan*'s holding would be altered if the relationship alleged were different. Indeed, the District of Columbia Court of Appeals has evaluated an intentional infliction of emotional distress claim in the school official-student context, and held the plaintiff there to the same standard of actionable conduct as described above and articulated in *Kerrigan* and *Kassem*. *See Newmyer v. Sidwell Friends School*, 128 A.2d 1023, 1037 (D.C. 2015).

Contrary to Mr. North's assertion, *Kassem* is less akin to his situation than *Kerrigan*. In *Kassem*, the plaintiff alleged that his employer "launched a sham investigation intended to establish" that it was the plaintiff that committed a serious error, and "fabricated evidence and pressured [plaintiff] to corroborate it." 513 F.3d at 253. The employer also "made false statements about [the plaintiff] to the [Nuclear Regulatory Commission] with the intent of inducing the NRC to initiate disciplinary action against" the plaintiff. *Id.* The district court dismissed the plaintiff's claim, relying on *Kerrigan* and the belief that Kassem's complaint "revolve[d] around purely occupational concerns with purely occupational consequences." 2006 WL 2474098, at *4 (D.D.C. Aug. 25, 2006). The D.C. Circuit disagreed, finding that the facts in *Kassem* went beyond *Kerrigan* because the employer alleged an intentional charge against the plaintiff with a government authority that could have subjected him to criminal penalties. 513 F.3d at 256. The equivalent in this case would be if the University or its administrators sought to initiate a criminal investigation of Mr. North, knowing him to be not responsible for the conduct alleged. But there is no such allegation here. In the absence of a similar claim of an intentional false report to government authorities, and considering the many parallels between *Kerrigan* and Mr. North's case, the Court finds that Mr. North has not alleged conduct sufficient to state a

claim for intentional infliction of emotional distress. This requires dismissing Counts Three, Four, and Five.

### B. Mr. North Has Not Established that A Claim Exists for Common Law "Basic Fairness" in the District of Columbia

Mr. North alleges that the University is responsible for breaching the common law "duty of basic fairness" in the investigative and disciplinary process. First Am. Compl. ¶¶ 151-52. Upon being challenged, Mr. North characterizes the claim as arising from the University's contractual obligations, Pl.'s Opp. 4-5, but his pleading characterizes it as a tort. First Am. Compl. ¶¶ 151-53 (alleging the existence of a duty, breach of that duty, and proximate cause between the breach and the injury); *see also Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Service*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."). Mr. North cites no authority to establish that this claim exists, *see generally* First Am. Compl. ¶¶ 150-53, Pl.'s Opp. 4-5, and to the extent he claims it arises from the University's contractual obligations, it would duplicate his breach of contract claim (Count One). Having failed to establish that relief may be granted for a common law "duty of basic fairness," Count Eight must be dismissed as well.

### C. Mr. North's Claims Against the University Administrators Acting in their Official Capacities Are Conceded

The University argues that all of Mr. North's claims against the University's administrators acting in their official capacities should be dismissed because claims that are alleged both against employees acting in their official capacity and the employer "merge." Mot. to Dismiss 3 (noting that only Counts Three and Four assert claims against Ms. Zeich and

11

Mr. Sawyer individually). Mr. North concedes that the claims merge and agrees that the litigation—where claimed both against the University and its administrators in their official capacities—should proceed only against the University. Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp.") 2 n.1. This means that for all counts other than Counts Three and Four, which name Ms. Zeich and Mr. Sawyer in their individual capacities, the individual defendants are dropped and Mr. North's claims will proceed only against the University. And because I previously determined that Counts Three and Four should be dismissed, *see supra* Section III.A., the practical import of both these determinations is that no claims remain pending against any individual defendant.

## IV.   Conclusion

For the foregoing reasons, the Defendants' Partial Motion to Dismiss will be granted. A separate order will issue.

Dated: April 30, 2018

TREVOR N. MCFADDEN
United States District Judge